# United States District Court
# District of Massachusetts

DANIEL RYAN,
    Plaintiff,

    V.                            CIVIL ACTION NO. 11-10023-NMG

GREATER LAWRENCE TECHNICAL SCHOOL,
JUDY A. DELUCIA as she is
    Superintendent of Greater Lawrence
    Technical School,
ELIZABETH FREEDMAN as she is
    Principal of Greater Lawrence
    Technical School, and
LINDA K. ZAKAS as she is
    Director of Curriculum at
    Greater Lawrence Technical School,
    Defendants.

# *REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#18)*

COLLINGS, U.S.M.J.

## I. Introduction

Originally filed in the state superior court, the present action was removed to the federal court in early January, 2011. (#1)  In his two-count complaint,

plaintiff Daniel Ryan ("Ryan") alleges claims for gender discrimination under federal and state law, respectively Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq* ("Title VII")[1], and Mass. Gen. L. c. 151B.[2] (#7) Defendants Greater Lawrence Technical School ("the School"), Judy A. DeLucia, as she is Superintendent of Greater Lawrence Technical School ("DeLucia"), Elizabeth Freedman, as she is Principal of Greater Lawrence Technical School ("Freedman"), and Linda K. Zakas, as she is Director of Curriculum at Greater Lawrence Technical School ("Zakas") (collectively "the defendants"), filed their answer to the complaint on January 10, 2011. (#3) Thereafter discovery was undertaken (*see* Electronic Clerk's Notes dated 05/19/2011) and an attempt at Alternative Dispute Resolution proved unsuccessful (#17).

On February 15, 2012, the defendants filed a motion for summary judgment and statement of undisputed facts (#18), a memorandum of law

---

[1]

Although there is no allegation in the complaint that Ryan filed an administrative charge of discrimination with the EEOC before filing suit, *see* 42 U.S.C. § 2000e-5(b), (e)(1), (f)(1), the Supreme Court has held "that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)(footnote omitted); *see also Morales-Cruz v. University of Puerto Rico*, 676 F.3d 220, 223 (1 Cir., 2012)("The charge-filing requirement is mandatory but not jurisdictional."). The defendants have not raised the issue in the context of the motion now at hand.

[2]

Count I of the complaint is captioned Declaratory Judgment while Count II is entitled Injunctive Relief. Nomenclature aside, it is undisputed that Ryan is pursuing claims for gender discrimination. *See* #19 at 1; #23 at 1.

(#19), and three affidavits with attached exhibits. (##20, 21, 22)  One month later on March 15, 2011, the plaintiff filed a memorandum in opposition to the dispositive motion and a Rule 56.1 statement (#23) along with exhibits (##24, 25, 26, 27) as well as a declaration (#28[3]).  The defendants filed a reply on March 27, 2012. (#33)  With the record now complete[4], the summary judgment stands ready for decision.

## II. The Facts

The following facts are gleaned primarily from the defendants' statement of undisputed facts (#18) and the plaintiff's statement of additional facts (#24), at times verbatim albeit without quotation marks.  If facts are disputed, it shall be duly noted and reference may be made directly to the underlying supporting materials.

The School provides public vocational education for approximately fifteen hundred students in grades 9-12 from Andover, North Andover, Lawrence and

---

[3]

Docket #28 is noted to be a Declaration of Daniel Ryan, but is in fact a Declaration of Theodore Xenakis.  The affidavit of Daniel Ryan has been refiled at the Court's request and is designated as #38 on the docket.

[4]

As the Court ruled on April 25, 2012, the defendants' motions to strike the plaintiff's declaration (#34), to deem the defendants' Rule 56 statement admitted and to strike portions of the plaintiff's statement of additional facts (#35) shall be treated as objections to portions of the summary judgment record submitted by the plaintiff and the plaintiff's opposition to those motions is deemed a response to the defendants' objections. (*See* Electronic Order dated 04/25/2012)

Methuen, Massachusetts. (#18 ¶ 1; #24 ¶ 1)  In order to provide that education, the School employs teachers specializing in different areas of instruction. (#18 ¶ 1; #24 ¶ 1)  Under Massachusetts law, the Principal of the School is responsible for hiring and firing teachers, subject to the review of the School Superintendent. (#18 ¶ 2; #24 ¶ 2)  The Principal of the School for the 2009-2010 academic year was Freedman[5]. (#18 ¶ 3; #24 ¶ 3)  During the time period relevant to the case at bar[6], defendant DeLucia was the Superintendent responsible for the School. (#18 ¶ 2; #24 ¶ 2)

The School is subject to the laws and regulations of the Commonwealth. (#18 ¶ 4; #24 ¶ 4)  Under the Massachusetts Education Reform Act of 1993, teachers in public schools who have held a teaching license for three years obtain "professional teacher status," i.e., tenure, with a school upon commencement of a fourth consecutive academic year for the school. (#18 ¶ 4; #24 ¶ 4); Mass. Gen. L. c. 71 § 41.  According to the statute, a teacher with professional teacher status enjoys significant job protections not afforded to teachers without that status. Mass. Gen. L. c. 71 § 42. The statute also provides

---

[5]

Before she was promoted to the position of Principal, Freedman had been the Assistant Principal for the 2007-2008 and 2008-2009 academic years, those being the first two years of the plaintiff's employment at the School. (#18 ¶ 3; #24 ¶ 3)

[6]

DeLucia retired in July of 2010. (#18 ¶ 2)

that "[a] teacher without professional teacher status shall be notified in writing on or before June fifteenth whenever such person is not to be employed for the following year." Mass. Gen. L. c. 71 § 41. If no such notice is given, then a teacher without professional teacher status is deemed to be appointed to a teaching position for the following academic year. Mass. Gen. L. c. 71 § 41.

Pursuant to the contract between the teachers' union and the School, over the course of a teacher's first three academic years, the teacher is formally evaluated on three occasions annually: between September 1st and November 30th; between December 1st and January 31st; and between February 1st and March 15th. (#18 ¶ 6; #24 ¶ 6) Each of the formal evaluations is completed after an administrator personally observes the teacher's performance in the classroom. (#18 ¶ 7; #24 ¶ 7) The first and third evaluations during the academic year are announced, while the second evaluation is unannounced. (#18 ¶ 7; #24 ¶ 7) The formal evaluations cover a number of specific categories, to wit, currency in the curriculum, planning and assessment of the class, class management, effective instruction, promotion of high standards, sensitivity to different learning styles and professional responsibility. (#18 ¶ 8; #24 ¶ 8)

At the School, the formal evaluations are performed by the administrative

staff including the Principal, the two Assistant Principals, the Director of Curriculum and Instruction, and the Coordinator of Data and Assessment. (#18 ¶ 9; #24 ¶ 9) The formal evaluations are used not only to ensure that students are receiving appropriate instruction, they are also considered by the Principal in determining whether to extend professional teacher status to a teacher. (#18 ¶ 10; #24 ¶ 10) According to Freedman, in making the determination of whether to extend professional teacher status to a teacher, a Principal weighs factors such as informal classroom observations, progress in continued learning, commitment to the school and/or extracurricular activities, the particular needs of the school, and the teacher's progress in light of prior instructions or directives. (#18 ¶ 11)

On or about August 15, 2007, Ryan was hired as a Social Studies Instructor for the 2007-2008 academic year. (#18 ¶ 12; #24 ¶ 12) During his first year teaching at the School, the plaintiff was evaluated by Freedman, who was then an Assistant Principal. (#18 ¶ 12; #24 ¶ 12) Ryan's initial evaluation[7]

---

[7] The Teacher Performance Evaluation is a form that lists seven general categories of functions, which are then further broken down into subparts or aspects of those categories to be evaluated. Thus, category I is Currency in Curriculum, which then has subparts A-C; category II is Effective Planning and Assessment of Curriculum and Instruction with subparts A-I; category III is Effective Management of Educational Environment with subparts A-E; category IV is Effective Instruction with subparts A-H; category V is Promotion of High Standards and Expectations for Student Achievement with subparts A-E; category VI is Promotion and Appreciation of Equity and Diversity with subparts A-B; and category VII is Professional Responsibility with subparts A-D. *See, e.g.*, Declaration of Elizabeth Freedman, #20, Exh. A.

reflects that Freedman found him to need improvement in three specific aspects of effective planning and assessment of curriculum and instruction, one aspect of effective management of educational environment, two aspects of effective instruction, two aspects of promotion of high standards and expectations for student achievement, and one aspect of promotion and appreciation of equity and diversity. Freedman noted, *inter alia*, that Ryan demonstrated a knowledge of American history, but that there was minimal interaction between the teacher and students and no differentiated material. (Declaration of Elizabeth Freedman, #20, Exh. A)  The plaintiff was observed to have lectured for the majority of the class asking very few questions and eliciting minimal student participation. (#20, Exh. A)  When Freedman reviewed the evaluation and her concerns about the plaintiff's teaching with him, she asked Ryan to consider observing another teacher to experience additional instructional strategies. (#18 ¶ 14; #24 ¶ 14)  Freedman recalls that Ryan was reluctant to accept her suggestion as it might make it appear that he was not a capable teacher. (#18 ¶ 14[8])

---

[8]       The plaintiff disputes his alleged reluctance to observe another teacher. (#24 ¶ 14) However, in his deposition, Ryan could not deny that it happened, only that he could not remember having expressed reluctance. (Declaration of Christopher J. Campbell, #22, Exh. A. at 194-196)  Further, the statement of George Tsekrekas (#24, Exh. 5) upon which the plaintiff relies in disputing this fact simply does not address the event at issue.

In Ryan's second evaluation which was also done by Freedman, he was found to need improvement in two aspects of effective planning and assessment of curriculum and instruction; one aspect of effective management of educational environment; one aspect of effective teaching; and one aspect of promotion of high standards and expectations for student achievement. (#20, Exh. B) Freedman commented that Ryan used basic recall question and answer strategies, but did not assess students who did not answer questions. (#20, Exh. B) She recommended that the plaintiff plan a variety of instructional strategies that would address different learning styles and a higher level of thinking, and also incorporate instructional strategies where students have a more active role in class. (#20, Exh. B) Freedman's recommendations for improvement in the second evaluation were largely comparable to the recommendations that she made in Ryan's first evaluation. (*Compare* #20, Exh. A with #20, Exh. B)

In Ryan's third evaluation in his first academic year, Freedman determined that the plaintiff needed improvement in two aspects of effective planning and assessment of curriculum and instruction; one aspect of effective

management of educational environment; two aspects of effective instruction and one aspect of promotion of high standards and expectations for student achievement. (#20, Exh. C) The recommendations for improvement were similar to the previous evaluations, to wit, plan instructional strategies that will address different learning styles and a higher level of thinking; incorporate instructional strategies where students have a more active role in class; and use formative assessments on a regular basis. (#20, Exh. C)

The plaintiff agreed at his deposition that Freedman's evaluations of his performance during his first two academic years were fair and honest appraisals of her view of his teaching. (#22, Exh. A at 102-104) Ryan does not believe that Freedman discriminated against him on the basis of his gender in those evaluations. (#22, Exh. A at 103) The plaintiff signed each of the evaluations without comment or rebuttal; he did not grieve any of the evaluations although he was entitled to do so. (#18 ¶ 21; #24 ¶ 21)[9]

---

[9]

The plaintiff has filed an Affidavit of Thomas Burke ("Burke"), who was Chair of the Social Studies Department at the School during Ryan's first two academic years. (#27, Exh. 19 ¶¶ 1, 2) Burke retired in June 2009. (#27, Exh. 19 ¶ 1) While Burke admittedly did not evaluate teachers as Chair, based on the time and opportunities he had to get to know Ryan, Burke found the plaintiff to be conscientious, enthusiastic, punctual and "as a novice teacher…interested in developing his effectiveness in the classroom." (#27, Exh. 19 ¶ 3) Burke states that Ryan got along well with both his colleagues and his students. (#27, Exh. 19 ¶ 4) According to Burke, Ryan was "a gentleman with a good work ethic, sense of humour and knowledge of his subject matter." (#27, Exh. 19 ¶ 5) The plaintiff has also submitted what appears to be a letter of recommendation for Ryan dated June 14, 2010 from George Tsekrekas, the subsequent Chair of the Social Studies Department at the School. (#24, Exh. 5) This letter is inadmissible, however, and cannot be considered.

During his first two years of teaching, Ryan had received from three to nine needs improvement ratings in each of Freedman's evaluations. (#18 ¶ 29; #24 ¶ 29)  In the plaintiff's view, the variance of six needs improvement ratings was within the expected range of scores due to the variables that go into evaluations. (#18 ¶ 29; #24 ¶ 29)

At the beginning of Ryan's final academic year, 2009-2010, Freedman was hired as Principal of the School. (#18 ¶ 22; #24 ¶ 22)  Responsibility for conducting the plaintiff's performance evaluations was transferred to Zakas, the Director of Curriculum and Instruction. (#18 ¶ 23; #24 ¶ 23)  During the prior two academic years, 2007-2008 and 2008-2009, Zakas had been the Freshman Academy Supervisor. (#18 ¶ 24; #24 ¶ 24)  While in that position, Zakas had provided support and oversight to Ryan who taught freshman Social Studies. (#18 ¶ 24; #24 ¶ 24)  At his deposition, the plaintiff conceded that throughout the first two years that he worked at the School, Zakas treated him in a cordial, fair and reasonable manner, and that she did not display any animosity based on his gender. (#18 ¶ 25; #24 ¶ 25)  Zakas was never hostile to him, nor did she ever treat him in a disparaging manner. (#18 ¶ 25; #24 ¶ 25)  To the contrary, Zakas provided resources and assistance to help Ryan succeed. (#18 ¶ 25; #24 ¶ 25)

In her first evaluation of Ryan, Zakas noted that the plaintiff's students provided basic recall answers but that the plaintiff did not facilitate the students delving into any higher order of thinking during the lesson. (#18 ¶ 26; #24 ¶ 26) Further, Zakas commented that Ryan was quick to provide the answers when students did not readily respond rather that exploring other ways to have the students engage in self-directed learning. (#18 ¶ 26; #24 ¶ 26) These concerns were comparable to concerns previously articulated by Freedman in Ryan's earlier evaluations. (*Compare* #20, Exh. A-F with #21, Exh. A)

In that first evaluation in the 2009-2010 academic year, Zakas' commendations for Ryan included: he has tried new instructional strategies in his class and is encouraged to continue; effective planning made very efficient use of time-on-learning and for very smooth transitions; communicates expectations for behavior and uses suitable moves to get attention; and he is seeking and using the advice and assistance of a specialist to supplement his own teaching. (#21, Exh. A)

As part of her recommendations for improvement, Zakas provided a number of suggestions to incorporate student-initiated learning and increased focus on including all of the students in the classroom activities. (#18 ¶ 28; #24

¶ 28)  Zakas rated the plaintiff as needing improvement in seven different aspects of the seven categories listed on the Teacher Performance Evaluation. (#18 ¶ 29; #24 ¶ 29)

Like the six evaluations conducted by Freedman during academic years 2007-2008 and 2008-2009, Ryan admits that Zakas' first evaluation in November 2009 was a fair and reasonable evaluation of his skills and performance as a teacher, albeit subjective. (#18 ¶ 30; #24 ¶ 30)  The plaintiff also agrees that Zakas' first evaluation was not motivated by discrimination. (#18 ¶ 30; #24 ¶ 30)  Lastly, it is undisputed that Zakas raised legitimate concerns with respect to the plaintiff's teaching in the evaluation. (#18 ¶ 30; #24 ¶ 30)

Zakas conducted Ryan's second evaluation on January 19, 2010, after an unannounced visit as provided in the union contract. (#18 ¶ 31; #24 ¶ 31)  During the class that Zakas observed, the plaintiff had the students fill in a four-page review worksheet for forty-three minutes in preparation for their midterm. (#22, Exh. A at 221)  Ryan states that it was not his practice to give a class a four-page worksheet to fill-in for an entire class, but that this was midterm preparation. (#22, Exh. A at 221-222)  The plaintiff concedes that that part of the lesson did not include a formative assessment of whether the students were

actually retaining knowledge and learning, a concern noted by Zakas. (#22, Exh. A at 220-221)  Ryan disagreed with Zakas' opinion that he was not assessing student learning during the lesson.  (#22, Exh. A at 220-221)  The sole commendation in the January 19, 2010 evaluation was the plaintiff's willingness to work on improving teaching strategies by seeking assistance from the Social Studies instructional coach and administration. (#21, Exh. B)

Zakas made suggestions to Ryan with regard to how he could develop effective teaching strategies. (#18 ¶ 36; #24 ¶ 36)  She also spent time in the plaintiff's classroom to assist him with those effective teaching strategies. (#18 ¶ 36; #24 ¶ 36)  Ryan took some of Zakas' suggestions for improvement, but did not follow others. (#18 ¶ 36; #24 ¶ 36)  The plaintiff agrees that, as of the second evaluation, Zakas was continuing to show a legitimate interest in him improving his performance. (#18 ¶ 37; #24 ¶ 37)

In the performance evaluation dated January 19, 2010, Zakas noted that Ryan needed improvement in sixteen different areas. (#21, Exh. B[10])  This represented more needs improvement ratings than Freedman had given him in any evaluation. (#18 ¶ 38; #24 ¶ 38)  Consequent to the performance

---

[10] Although Zakas states in her declaration that she rated the plaintiff as needing improvement in fourteen areas (#21 ¶ 8), a tally of the X-marked boxes adds up to sixteen. (*See* #21, Exh. A)

deficiencies reflected in this evaluation, Zakas checked a box on the Teacher Performance Evaluation which indicated there would be a performance improvement plan[11], including additional unannounced visits to Ryan's classes prior to the next evaluation. (#18 ¶ 39; #24 ¶ 39)

In her recommendations for improvement, Zakas suggested that Ryan take advantage of professional development opportunities given after school at GLTS to increase his repertoire of teaching strategies. (#21, Exh. B) The plaintiff did not follow that recommendation. (#22, Exh. A at 233-234) Ryan did participate in a number of other professional development classes and courses. (#24, Exh. 6) When the plaintiff's failure to take additional classes was discussed with him, Ryan stated that he did not want to invest his time in the additional classes until he knew whether he would obtain professional teacher status. (#18 ¶ 42; #24 ¶ 42)

The plaintiff's third and final evaluation of academic year 2009-2010 reflects that he did not demonstrate any noticeable improvement. (#18 ¶ 44;

---

[11]

Prior to academic year 2009-2010, School administration and the teachers' union had not reached an agreement as to the appropriate circumstances that would warrant a performance improvement plan. (#18 ¶ 40) Although there was not an agreed-upon form at that time, by academic year 2009-2010, there was general agreement with the union that administrators could check the performance improvement box, and that the recommendations in the evaluation would serve as the improvement plan. (#18 ¶ 40) Both male and female teachers had this box checked during academic year 2009-2010. (#18 ¶ 40) Although these facts are disputed (#24 ¶ 40), in his deposition the plaintiff basically admitted that he had no knowledge on the subject. (#22, Exh. A at 238-239)

#24 ¶ 44)  For example, Zakas noted that Ryan did not effectively ensure that all students were participating in a way that meaningfully engaged the students in the classroom, and that the plaintiff's students continued to present information at a basic recall level without demonstrating any higher order of thinking or learning. (#18 ¶ 44; #24 ¶ 44)  This evaluation incorporated two commendations: First, improvement in many areas such as formative assessments, timing, chunking of information and the use of the 10/2 rules were noted and Ryan was exhorted to keep up the efforts to grow professionally, and, second, the plaintiff's willingness to work on improving teaching strategies by seeking assistance from the Social Studies instructional coach and administration. (#21, Exh. C)

During the 2009-2010 academic year, Freedman did frequent walk-throughs of all classrooms, including that of the plaintiff, and she continued to see a lack of progress in Ryan's performance. (#18 ¶ 51; #24 ¶ 51)  Freedman also reviewed the evaluations of Ryan performed by Zakas and confirmed that the plaintiff was still exhibiting unsatisfactory performance in the same areas that she had identified. (#18 ¶ 54; #24 ¶ 54)  In Freedman's view, Ryan had consistently received the same feedback and suggestions since beginning his

employment, but had failed to address performance deficiencies.[12] (#20 ¶ 25)

Further, Freedman states that the plaintiff never prepared any rebuttal or

response to the ongoing negative evaluations he received, or otherwise

demonstrated a commitment to improving his teaching methodology. (#20 ¶

25)

Although Freedman obtained confirmation of Ryan's ongoing

performance issues from Zakas during 2009-2010, she did not seek or receive

input from Zakas in forming her personal opinion as to whether the plaintiff

would be offered professional teacher status. (#20 ¶ 23)  Freedman did not

tally or compare the number of needs improvement ratings that Zakas gave

Ryan; the fact that Zakas gave more needs improvement ratings to the plaintiff

than Freedman had did not influence Freedman's decision to discharge the

plaintiff.[13] (#20 ¶ 23)

According to Freedman, her decision to terminate Ryan was based on a

---

[12]

Ryan disputes this statement, but provides no record citation in support of his position. (#24 ¶ 53)

[13]

Ryan disputes these facts to the extent that Freedman states in the  June 7, 2010 termination letter that her decision was based upon the needs improvement rating in his written evaluations. (#24 ¶ 49)  In fact, the termination letter reads: "The reasons for this non-renewal decision are *relative to areas being noted as needs improvement*" in the first six categories on the teacher evaluation forms, not on the number of needs improvement ratings. (#20, Exh. G (emphasis added)).

number of factors, most particularly her personal evaluations of him during his first two years of teaching when she found that he consistently struggled to demonstrate good teaching. (#20 ¶ 24) In addition, the plaintiff failed to circulate in class, he failed to vary his instructional strategies, he failed adequately to account for different learning styles or consistently track whether all the students in the class were learning. (#20 ¶ 24) Freedman had raised these concerns with Ryan beginning in 2007, and she did not observe sufficient improvement throughout the subsequent two academic years.[14] (#20 ¶ 24)

In her deposition, Freedman testified that Ryan was professional (#27, Exh. 16 at 146) and "a very nice person ...who does not exhibit the high level that I think needs to be met." (#27, Exh. 16 at 148) She observed a "rigidness...from beginning to end" in Ryan's "ability to understand what continuing to grow to be able to provide those [instructional] strategies were." (#27, Exh. 16 at 150) From Freedman's perspective, the plaintiff "was not able to...effectively engage the students using the strategies that I believe help students learn best." (#27, Exh. 16 at 152) Freedman stated that:

> I just didn't see the recommendations being

---

[14]

Ryan disputes these facts to the extent he generally contends that they are not reflective of what the performance evaluations and records in the case show. (#24 ¶ 50)

followed through on. I did not see that higher order thinking that students engage in a way that I feel like has been put through all these evaluations that we have been focusing on at the school. I just don't feel that I saw it or that I felt he...was changing at a rate that needed to be changed for me to make him a professional status teacher.

*****

I would have considered, if it had not been professional status year, in terms of – because I had seen some growth, but not enough to keep him. Had there been that, I would have considered that.

#27, Exh. 16 at 154, 161.[15]

Freedman decided that Ryan would not be offered a position for the academic year 2010-2011, thereby effectively denying him professional teacher status. (#18 ¶ 46; #24 ¶ 46) It is undisputed that Freedman made the decision not to renew the plaintiff for a fourth academic year. (#20 ¶ 20; #22, Exh. A at 123, 168-169) According to Freedman, she formed her own conclusions about Ryan's non-renewal founded on her personal assessment of his teaching abilities. (#20 ¶ 21) This conclusion was reached following an independent investigation into Ryan's teaching performance, including direct observations of his teaching over the course of three years. (#20 ¶ 21) Based on her

---

[15] Despite the plaintiff's contentions, nothing in the Notice of Intent To Terminate Employment letter (#20, Exh. G) foreclosed Freedman from considering factors other than, or in addition to, Ryan's teacher evaluation forms when deciding whether to offer him professional teacher status.

observations, Freedman independently concluded that Ryan would not be offered professional teacher status at the School. (#20 ¶ 21)[16]

Freedman discussed her initial concerns regarding the plaintiff with other administrators and DeLucia at a meeting in or about January 2010. (#18 ¶ 48; #24 ¶ 48)  Freedman made the discharge decision in or about April 2010, and other administrators and the Superintendent were informed of the list of teachers who would not be awarded professional teacher status at a meeting in May 2010. (#18 ¶ 48; #24 ¶ 48)

On or about June 7, 2010, the following letter from Freedman was delivered to Ryan:

> In accordance with Massachusetts General Laws Chapter 71, § 41, I am writing to notify you of my intent not to renew your appointment for the 2010-2011 school year, thus dismissing you as an employee of Greater Lawrence Technical School, effective June 18, 2010. The reasons for this non-renewal decision are relative to areas being noted as needs improvement and specifically:
>
> • Currency in the Curriculum
> • Effective Planning and Assessment of Curriculum and Instruction

---

[16]

Ryan disputes that Freedman "independently concluded" that he would not be offered professional teacher status because in reaching her decision Freedman relied, in part, on the number of needs improvement ratings in his performance evaluations, the final three of which were completed by Zakas. (#24 ¶ 47)

- Effective Management of Educational Environment
- Effective Instruction
- Promotion of High Standards and Expectations for Student Achievement
- Promotion and Appreciation of Equity and Diversity

The documents relating to the grounds for such non-renewal are your performance evaluations, contained within your personnel record.

You may review this decision with Superintendent Dr. DeLucia within ten (10) school days of receipt of this letter and to present information pertaining to the basis for the decision and to your status. You may be represented by an attorney or other representative at such meeting. Should you wish to exercise this right, please contact Kate Keyes at extension 1012 to schedule a meeting. Alternatively, should you wish to resign from your employment effective on the last day of school, June 18, 2010, you may do so, in which case our records reflect that action.

I will advise you of my final decision, which is reviewed the Superintendent, following your meeting with her. If you do not elect to meet with Dr. DeLucia, I will advise you of my final decision following the expiration of the above-referenced ten-day period via certified mail.

#24, Exh. 7.

Ryan appealed the discharge decision to DeLucia, the Superintendent, who then reviewed the circumstances of the plaintiff's separation and upheld the non-renewal decision. (#18 ¶ 56; #24 ¶ 56)

Nothing in the six evaluations performed by Freedman during Ryan's first two academic years at the School demonstrates gender bias. (#18 ¶ 58; #24 ¶ 58)  Freedman never made any statements that caused the plaintiff to believe she harbored gender bias. (#18 ¶ 59; #24 ¶ 59)  Ryan does not believe that Freedman harbors any animus towards males, and she never displayed any such animus. (#22, Exh. A at 128)  The plaintiff takes the position that Zakas gave Freedman biased information that Freedman relied upon in making the determination to terminate him. (#22, Exh. A at 126-127; #38 ¶ 9)

Until the second and third evaluations in the 2009-2010 academic year, Ryan concedes that Zakas treated him professionally and cordially, and that she tried to help him with his teaching performance. (#18 ¶ 61; #24 ¶ 61)  Similarly, until the second and third evaluations in the 2009-2010 academic year, in Ryan's view Zakas had never displayed any hostility based on gender. (#18 ¶ 62; #23 ¶ 62)

According to Zakas, she remembers making a single comment regarding gender during an informal meeting with Ryan and two other co-employees. (#21 ¶ 14)  At that meeting, after observing that no coffee and donuts were provided, Zakas remarked that a woman was needed in the department. (#21 ¶ 14)  Zakas claims she made the comment because a former female employee

used to bring coffee and donuts to meetings; it was an offhand, joking remark that was not directed at the plaintiff. (#21 ¶ 14)  Zakas avers that she never considered the gender of any teacher or applicant in her evaluations or recommendations for hire. (#21 ¶ 14)

In an affidavit, Ryan disputes that Zakas' comment was an offhand joke, or that it was made in the context of needing coffee and donuts at departmental meetings, but at his deposition he could not remember the specifics of the conversation other than the one particular comment. (#22, Exh. A at 84; #24 ¶ 64; #38 ¶¶ 4-7[17])  Although the plaintiff testified that Zakas made a similar comment on one or two other occasions, he could provide no specifics or context for that contention. (#22, Exh. A at 79-87[18])

Freedman testified that she only became aware of Zakas' gender comment after Ryan's meeting with DeLucia when he appealed his termination. (#24,

---

[17]

In his declaration, Adam Porro, another history teacher who was present at the time, states that Zakas came into the classroom, looked at all of the male teachers and then stated that "We really need a female in this department." (#24, Exh. 9 ¶ 4)  Porro does not recall Zakas making any reference to a female being needed because a female would know to bring coffee and donuts to a meeting. (#24, Exh. 9 ¶ 4)  Porro avers that when Zakas left the room he, Porro, stated that Zakas' statement showed a double standard because if a male administrator made that comment to an all female department, he would be fired within a week. (#24, Exh. 9 ¶ 6)

[18]

In his affidavit, Ryan states that "[t]here were other times during my last year teaching at Greater Lawrence Technical School that Linda Zakas made similar comments about the need for female teachers in the history department." (#38 ¶ 8) Like his deposition testimony, this statement is vague, lacking in specifics or context.

Exh. 14-A at 4) Freedman remembered the comment as a flippant remark having to do with donuts and coffee or needing a woman's touch or something of that sort. (#24, Exh. 14-A at 6-10)

After the plaintiff's separation, Zakas interviewed and recommended a male candidate for hire to replace Ryan. (#18 ¶ 66; #24 ¶ 66) Throughout Ryan's employment, the School had roughly equal numbers of male and female teachers. (#18 ¶ 67; #24 ¶ 24) At the end of the 2009-2010 academic year, Freedman denied professional teacher status to approximately equal numbers of male and female teachers. (#18 ¶ 68; #24 ¶ 68)

### III. The Summary Judgment Standard

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1 Cir., 2005) (internal quotations marks and citation omitted). When considering a motion for summary judgment, "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

a judgment as a matter of law." Fed. R. Civ. P. 56(a).[19] The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1 Cir., 2003)(citations omitted); *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1 Cir., 2010).

> Once the moving party alleges the absence of all meaningful factual disputes, the non-moving party must show that a genuine issue of material fact exists. This showing requires more than the frenzied brandishing of a cardboard sword. The non-moving party must point to facts memorialized by materials of evidentiary quality and reasonable inferences therefrom to forestall the entry of summary judgment.

*Certain Interested Underwriters at Lloyd's, London v. Stolberg*, 680 F.3d 61, 65 (1 Cir., 2012)(internal citations and quotation marks omitted); *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1 Cir., 2006).

In determining whether summary judgment is proper, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Clifford v. Barnhart*,

---

[19]

Rule 56 was amended effective December 1, 2010. The summary judgment standard is now set forth in Rule 56(a), but "[the standard for granting summary judgment remains unchanged." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 n.4 (1 Cir., 2011).

449 F.3d 276, 280 (1 Cir., 2006); *Guay v. Burack*, 677 F.3d 10, 13 (1 Cir., 2012). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986))(further internal quotation marks omitted).

## IV. Discussion

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Massachusetts General Laws chapter 151B is to the same effect:

> It shall be an unlawful practice [f]or an employer,…because of the race, color, religious creed, national origin, sex, sexual orientation,…or ancestry of

any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

Mass. Gen. L. c. 151B § 4(1).

To establish a claim for sex discrimination under these statutes, a plaintiff must show that he/she experienced an adverse employment action taken on the basis of his/her gender. *Morales-Cruz v. University of Puerto Rico,* 676 F.3d 220, 224 (1 Cir., 2012). Here, Ryan claims that he was subjected to gender discrimination consequent to Freedman's decision to deny him professional teacher status by discharging him at the end of his third academic year of teaching at the School. More specifically, while acknowledging his belief that Freedman did not harbor any animus towards males and that she never displayed any such animus, the plaintiff contends that Freedman relied on biased teacher evaluations completed by Zakas in reaching her decision to terminate him.

The First Circuit has recently had occasion to recap the applicable framework in which the plaintiff's claim should be analyzed:

We evaluate an employment discrimination claim for which there is no direct evidence of discrimination by applying the three-stage framework of the *McDonnell Douglas* burden-shifting analysis. *Thompson v. Coca–Cola Co.*, 522 F.3d 168, 176 (1st Cir. 2008); *Rossy v. Roche Prods., Inc.*, 880 F.2d 621, 625 (1st Cir. 1989); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must show a prima facie case of employment discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff succeeds, '[t]he burden then shifts to the defendant to present a legitimate, non-discriminatory reason, sufficient to raise a genuine issue of material fact as to whether it discriminated against the employee, for the employment decision.' *Quiñones v. Buick*, 436 F.3d 284, 289 (1st Cir. 2006). If the defendant provides such a reason, 'the *McDonnell Douglas* framework — with its presumptions and burdens — is no longer relevant.' *Vélez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 447 (1st Cir. 2009) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (internal quotation marks omitted). Instead, the ball returns to the plaintiff's court, in which []he must prove by a preponderance of the evidence that defendant's alleged nondiscriminatory reason was in fact a pretext for discrimination. *Quiñones*, 436 F.3d at 289.

*Goncalves v. Plymouth County Sheriff's Dept.*, 659 F.3d 101, 104-105 (1 Cir., 2011) (footnote omitted[20]).

---

[20]

Citing *Quiñones v. Buick*, 436 F.3d 284, 289 n. 1 (1 Cir., 2006), the Court noted in footnote 3 that the same burden-shifting "analysis applies to Title VII claims and to claims brought pursuant to Mass. Gen. Laws ch. 151B." *Goncalves*, 659 F.3d at 104.

The defendants assert that Ryan is unable to establish his prima facie case because he cannot show that he was performing the duties of his job at a sufficiently acceptable level so as to be granted professional teacher status. However, the bulk of the defendants' argument is directed to the question of whether the plaintiff has adduced evidence that the defendants' articulated business reasons for his dismissal were a pretext for discrimination. In a comparable scenario, the First Circuit determined:

> it both expeditious and appropriate under these circumstances to 'assume that [the plaintiff] has made out a prima facie case in order to move on to the real issues in the case.' *García v. Bristol–Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir. 2008). Indeed, we have observed that, '[o]n summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus.' *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996).

*Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 662 (1 Cir., 2010). The Court shall follow the First Circuit's advice.

The defendants have stated a nondiscriminatory reason for dismissing Ryan: his job performance was consistently below the level necessary to obtain

professional teacher status. The plaintiff's teaching deficiencies were consistently detailed by Freedman in the six teacher evaluations she completed during Ryan's first two years of teaching, and observed by her during classroom walk-throughs in his third year of teaching. Comparable teaching deficiencies were recorded by Zakas in the plaintiff's third-year teacher evaluations.

Turning now to the plaintiff's burden, "pretext can be established by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's offered reasons for the termination that a 'reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Bonefont-Igaravidez v. International Shipping Corp.*, 659 F.3d 120, 124 (1 Cir., 2011)(quoting *Gómez–González*, 626 F.3d at 662–63 (further citation omitted)). Ryan relies on two types of evidence[21] in his attempt to prove pretext.

The first evidence is Zakas' remark about the Social Studies department

---

[21] Ryan also relies on Burke's affidavit (#27, Exh. 19) as demonstrating an inconsistency in the evidence. However, Burke freely admits that he did not evaluate teachers since he did not hold an administrative post. Further, while Burke stated that "as a novice teacher [the plaintiff was]...interested in developing his effectiveness in the classroom" (#27, Exh. 19 ¶ 3), Burke does not in any way assess the effectiveness Ryan's teaching skills and strategies. Thus, Burke's opinion does not contradict that of Freedman on this crucial point.

needing a woman teacher at a time when all of the teachers in the department were male.[22] The parties dispute the import of this comment. Zakas explains that she meant it as an offhand, flippant remark in reference to the fact that a former female history teacher used to bring coffee and donuts to meetings. Ryan disputes that the remark was meant to be a joke and, although the plaintiff did not remember the specifics of the conversation, his colleague, Adam Porro, recalls no reference to a female being needed so that snacks would be provided at departmental meetings.

"'Title VII does not prohibit ... simple teasing, offhand comments, and isolated incidents (unless extremely serious).'" *Morales-Cruz*, 676 F.3d at 225-226 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)(citations and internal quotation marks omitted)). The law is clear that ""'stray workplace remarks," as well as statements made either by non-decisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus.'" *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 54 (1 Cir., 2010)(quoting

---

[22]

Although the plaintiff testified that there were other gender comments made by Zakas, his inability to provide any specifics with respect to content, time or place of those purported comments render his testimony too vague upon which to rely.

*González v. El Día, Inc.,* 304 F.3d 63, 69 (1 Cir., 2002)).  It is undisputed that Freedman, the decisionmaker, was unaware of this comment until after she served Ryan with notice of termination.  Consequently, there is no direct causal connection between the comment and Freedman's decision not to offer the plaintiff professional teacher status. *Melendez,* 622 F.3d at 54 (citing *Rivera-Aponte v. Restaurant Metropol #3, Inc.*, 338 F.3d 9, 12 (1 Cir., 2003) ("The lack of a direct connection between the words and the employment action significantly weakens their probative value.") (citation omitted)).

That having been said, in light of Ryan's theory that Freedman unwittingly relied on biased evaluations from Zakas in making her decision[23], the gender comment is relevant but of minimal significance.  While the remark is alleged to have been made during the course of Ryan's third year of employment, the exact timing has not been established.  Thus, the temporal relationship between the comment and employment decision is unknown and, consequently, weak. *Melendez,* 622 F.3d at 54-55 (citing *McMillan v. Mass. Soc'y*

---

[23]      While the defendants argue that the undisputed facts show that Freedman independently made the decision to terminate, the teacher evaluations completed by Zakas were part of the mix of factors she considered. (#18 ¶ 54; #24 ¶ 54)  For example, in her declaration, Freedman states that "[d]uring 2009-2010, I obtained confirmation of Plaintiff's ongoing performance issues from Ms. Zakas (*e.g.* his failure to adequately promote higher thinking and student-directed learning) and that Plaintiff failed to take further classes to develop his teaching methodologies." (#20 ¶ 23; *see also* #18 ¶ 10; #24 ¶ 10 (Teacher evaluations are considered by the Principal in determining whether to extend professional teacher status to a teacher.))

*for the Prevention of Cruelty to Animals*, 140 F.3d 288, 301 (1 Cir., 1998)("[E]ven if [stray] remarks are relevant for the pretext inquiry, their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision.")). Moreover, even assuming that gender bias is ascribed to this single remark, it is antithetical to the weight of the undisputed evidence.

Ryan agrees that during his first two years of employment at the School, Zakas, in her position as Director of Curriculum and Instruction provided support, oversight, resources and assistance to help him succeed. During those years, Zakas treated him in a fair and reasonable manner, was never hostile, and did not display any animosity based on his gender. In her first evaluation of Ryan, Zakas noted concerns with the plaintiff's performance that were comparable to those noted by Freedman in earlier evaluations. Ryan agreed that this evaluation was fair, reasonable and not motivated by discrimination.

With respect to the second evaluation, Ryan conceded that Zakas continued to show a legitimate interest in him improving his performance. She made suggestions to the plaintiff on how to develop effective teaching strategies, and spent time in his classroom to assist him in implementing those

strategies. However, Ryan contends that his second evaluation as well as the third evaluation by Zakas were biased against him on account of his gender. These final two evaluations by Zakas were consonant with evaluations done by Freedman in that Ryan continued to exhibit unsatisfactory performance in the same areas that Freedman had previously identified. The plaintiff has proffered no evidence to suggest any reason for this purported sea change in Zakas' attitude towards him beginning in January, 2010, the date of his second evaluation. Following Ryan's termination, Zakas interviewed and recommended a male candidate to be hired to replace the plaintiff.

Based on all of the evidence, the single gender comment made by Zakas was an isolated remark that alone is simply inadequate to raise a genuine issue of material fact as to pretext.

As the second type of evidence submitted to prove pretext, Ryan has filed one hundred seventy-two pages of performance evaluations of teachers other than the plaintiff that were completed by Zakas during the three academic years the plaintiff worked at the school (#26, Exh. 13 and 13 cont., #27, Exh. 13 2nd cont.) and a spreadsheet (#27, Exh. 14[24]). Ryan also proposed additional facts

---

[24]

The plaintiff has offered no explanation as to either the source of the information in this spreadsheet (it cannot be the Zakas evaluations as they do not address all non-professional teachers 2006-2010 or

(#24 ¶¶ 7-13) based on these exhibits.

Ryan has not identified the person who undertook the calculations upon which his proposed additional facts or the spreadsheet are based, nor has an affidavit of that person been filed, so the methodology employed is unknown. On their face, however, the basis for the figures is unfathomable. For example, on each teacher evaluation form there are a total of 144 boxes that potentially could be checked. (*See*, *e.g.*, #20, Exh. A) However, for each subpart in the categories, only 1 of 4 boxes would be checked, so a total of 36 boxes would be checked on each evaluation. Ryan states that "[d]uring Plaintiff's three years at GLTS, Zakas checked off 108 Needs Improvement boxes out of a total of 555 boxes for six male academic teachers that she evaluated." (#24 ¶ 8) It is unclear how the total of 555 boxes was reached since that figure is not evenly divisible by either 36, the total number of needs improvement boxes on each teacher evaluation, or 144, the total number of boxes on each evaluation form. The same is true with respect to the statement that "Zakas checked off only 19 Needs Improvement boxes out of a total of 777 boxes for seven female academic teachers." (#24 ¶ 8) The total number of boxes claimed by the plaintiff, 777,

---

nonrenewals) or what the information is supposed to represent. Since the information is unverified and, as a result, unverifiable, it cannot be relied upon as evidence to establish pretext.

is not evenly divisible either by the total number of needs improvement boxes on each form, 36, or the total number of boxes on each form, 144. So, too, it is unclear how six male teachers could have a total of 555 boxes or 92.5 each (555 divided by 6), but seven female teachers are said to have a total of 777 boxes or 111 each (777 divided by 7). How could one additional female teacher account for 222 additional total boxes (again, a number not evenly divisible by 36 or 144)?

The bottom line is that it is unclear what the plaintiff's figures represent, i.e., if the 555 and 777 boxes are not the total of either all boxes on the teacher evaluations or the total of all needs improvement boxes on the teacher evaluations, of what are they the total?[25] Since all of the percentages Ryan uses to show the alleged disparity between Zakas' evaluations of male and female teachers derive from these figures, they, too, remain unexplained and, consequently, unreliable. (#24 ¶¶ 8-10, 12)

The plaintiff's statistics are also infirm because no context or analysis has been provided for them. *See*, e.g., *Rodriguez v. Smithkline Beecham*, 224 F.3d 1, 7 (1 Cir., 2000) ("Although the figures admitted by appellant undeniably

---

[25] The same is true for the "407 boxes" for the five male teachers Zakas evaluated after Ryan was terminated. (#24 ¶ 10)

demonstrate that more males than females held higher paying positions at Smithkline's facility, the numbers are not provided in a context which would lend them probative value in a statistical sense."). For example, were these teachers also evaluated by administrators other than Zakas like Ryan was and, if so, how did those evaluations compare with the ones Zakas completed? Were these teachers in their first, second or third year of teaching, and did the evaluation standards vary based on the individual's teaching experience? Were the detailed written comments in the teacher evaluations considered to explain the boxes checked? In other words, there has been no exploration of explanations other than gender to explain the plaintiff's statistics.

Lastly, Ryan has failed to explain any connection between the supposed statistics regarding evaluations of teachers other than himself and his own allegedly unlawful termination. The First Circuit has recognized that statistical evidence is of limited probative value in a disparate treatment case:

> In a disparate treatment case...., the central focus 'is less whether a pattern of discrimination existed [at the company] and more how a particular individual was treated, and why.' *Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 156 (1st Cir.1990). As such, statistical evidence of a company's general hiring patterns, although relevant, carries less probative weight than it does in a disparate impact case. *See id.;*

Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 184 n. 3 (1st Cir.1989) (questioning how statistics showing a low percentage of African Americans and women at A & P would have been admissible in a disparate treatment case). In this context, statistical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee. *See Walther v. Lone Star Gas Co.*, 977 F.2d 161, 162 (5th Cir.1992). This is because a company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when dismissing a particular individual. *Gadson v. Concord Hosp.*, 966 F.2d 32, 35 (1st Cir.1992). 'Without an indication of a connection between the statistics,' the practices of the employer, and the employee's case, statistics alone are likely to be inadequate to show that the employer's decision to discharge the employee was impermissibly based on age. *Id.*

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 848 (1 Cir., 1993)(footnotes omitted), *cert. denied*, 511 U.S. 1018 (1994); *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 32 (1 Cir., 2003)("Valid statistical evidence may play a helpful role even in disparate treatment cases, but only if it tends to prove the discriminatory intent of the decision makers involved. That often will be difficult."); *Lawton v. State Mutual Life Assurance Company of America*, 924 F. Supp. 331, 344 (D. Mass.), *aff'd*, 101 F.3d 218 (1996).

For all of these reasons, the plaintiff's statistics are not competent evidence or probative on the issue of pretext. Even if the statistics were to be considered, they are inadequate as a matter of law to permit a jury to conclude

that the defendants discriminated against the plaintiff on account of his gender when they terminated his employment.

To summarize, all of the evidence presented by the plaintiff, considered as a whole, does not constitute "'minimally sufficient evidence to permit a reasonable factfinder to conclude that [he] was fired because of [his gender].'" *Garcia v. Bristol-Myers Squibb Company*, 535 F.3d 23, 31 (1 Cir., 2008)(quoting *Davila v. Corporacion De P.R. Para La Difusion Publica*, 498 F.3d 9, 16 (1 Cir., 2007)).

## V. Conclusion and Recommendation

For all of the reasons stated, I RECOMMEND that Defendants' Motion For Summary Judgment (#18) be ALLOWED, that all other pending motions be TERMINATED, and that FINAL JUDGMENT enter for the defendants.

## VI. Review by the District Judge

The parties are hereby advised that any party who objects to these recommendations must file a specific written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for

such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

July 19, 2012.